**WARREN TELECHRON CO. v. WALTHAM WATCH CO. and three other cases.**

**Nos. 3865–3868.**

District Court, D. Massachusetts.

Jan. 27, 1936.

Hector M. Holmes, of Boston, Mass., Charles Neave and Alexander C. Neave, both of New York City, and Harrison F. Lyman, of Boston, Mass., for plaintiffs.

Alan B. Bagley and Herbert A. Baker, both of Boston, Mass., and Harold F. Wilhelm, of New York City, for defendant.

BREWSTER, District Judge.

The above entitled infringement suits were tried together under a stipulation that the evidence, so far as relevant, should be received upon all cases. Three letters patent of the United States are involved, namely, No. 1,283,434 (referred to hereafter as the Warren clock patent); No. 1,334,-423 (referred to hereafter as the Warren indicator patent); and No. 1,892,552 (referred to hereafter as the Holtz patent).

The reason for the four bills of complaint is that the parties plaintiff have subdivided the rights under the patents involved in different fields by licensing arrangement.

The plaintiff Warren Telechron Company is the owner of the Warren patents and exclusive licensee in the clock field under the Holtz patent. The plaintiff Sangamo Electric Company is the owner of the legal title to the Holtz patent, and the plaintiff General Electric Company is the exclusive licensee under both the Warren and the Holtz patents for certain fields. The defenses were anticipation, noninvention, and noninfringement.

## Statement of Facts.

### I. Warren Clock Patent.

1. On his application dated February 26, 1917, letters patent of the United States No. 1,283,434 were issued to Henry E. Warren covering an alleged improvement in timing devices. According to his specifications, the object of Warren's invention was "to provide a timing device or clock which is directly and continuously driven by a self-starting synchronous motor capable of starting and stopping substantially in an instant and of running continuously at a uniform speed, and which for the best results is supplied with alternating current whose average frequency has been accurately regulated."

2. Before taking up the details of this patent, it will be helpful to consider the problem which confronted Warren and how he set about to solve that problem.

Warren, in 1912, organized a small company to manufacture and sell "battery" clocks of the pendulum type supplied with current intermittently from a battery which took the place of the ordinary spring drive.

Owing to the expense and delicacy of the battery clocks, they were not wholly satisfactory to Warren, and he began to direct his attention to the possibility of building a clock that could be actuated by the al-

ternating current supplied to the householder for lighting and other domestic purposes. After working some time along this line, he produced a clock device which was actuated by a motor, operable by a single phase alternating current, and self-starting. This device was substantially that shown in the drawings of the Warren clock patent.

Having perfected his clock, he found that, owing to the variation from uniformity in the frequency of the current supplied by the central station, the clock would not keep accurate time. Warren then brought the matter to the attention of the officials of the utility company furnishing the electric current for lighting purposes and finally induced it to install a master clock which Warren devised, by the means of which it was possible to obtain uniformity of frequency by regulating the speed of the steam turbines driving the generator. After the master clock had been installed, it was found that the frequency was sufficiently uniform to enable one, by plugging into the ordinary light socket, to secure accurate time with the clock of the patent. The Warren clock patent shows not only the mechanism by which the driving power of the motor is communicated to the hands of the clock, but also the construction of the motor which Warren developed for use in this timing device. The disclosures of the clock patent also relate to means for operating the clock by springs, in the event that the electric current fails at any time.

3. In this controversy we are concerned only with the motor and claims 1, 2, 3, 8, and 9 are the only claims in dispute.

Claim 1 is sufficiently illustrative. It reads as follows:

"1. A timing device comprising time indicating means, a self starting synchronous motor inherently capable of running continuously at a uniform speed in exact synchronism with a sinuous alternating current, and having its rotor directly connected with said time-indicating means, whereby said timing device is capable of making known the exact length of time that the current has been flowing in a circuit in which the timing device is included, irrespective of the number of interruptions of the current flowing through said circuit.

Claim 2 refers to the rotor as being inherently capable of revolving in exact synchronism with the magnetic field.

Claim 3 refers to the self-starting synchronous motor as one "having a split phase field responsive to a continuous alternating current. * * * "

In claim 9 it is stated that the rotor is inherently capable of self-starting and running in absolute synchronism with the alternations of the current.

It should be noted that, according to the file wrapper, Warren's claims were several times rejected upon prior patents and that before his claims were allowed he had stressed particularly the fact that his motor was a self-starting synchronous motor, inherently capable of running continuously at a uniform speed in exact synchronism with a sinuous alternating current. The Patent Office seems also to have been impressed with the fact that he had embodied in his alleged invention auxiliary means for operating the clock, in the event of an interruption in the electric current.

4. On the question of anticipation, it is interesting to note that about two years before Warren began his study of the problem of operating clocks on alternating current used for lighting purposes one Arthur F. Poole had thought along almost identically the same lines. I refer to letters patent of the United States No. 1,310,372, issued to Poole upon his application filed September 12, 1914. This patent shows a system of electric clocks with a master clock at the central, or generating, station and a series of secondary clocks adapted to be installed in the house of the consumer, with a synchronous motor operating the clock mechanism. He recites that one of the objects of his invention is to use the apparatus in connection with light and power distribution, and to that end he provides means to synchronize the alternating current generator at the central station with a master clock. He sets out, somewhat in detail, his means of regulating the generator so that the frequency will be fairly constant or uniform.

While the secondary clocks constitute an essential part of his disclosed electric clock system, his specifications do not deal with the construction of the motor which controls the mechanism of the secondary clock. He says that this mechanism consists of a small synchronous motor which is geared by suitable reduction gearing to the clock hands.

5. The idea of a system of secondary clocks, driven by alternating currents received from a central station where the generator was regulated to produce uniformity of frequency, was not original with

564

Poole. In 1896, in the Electrotechnische Zeitchrift, a scientific periodical published in Germany, an article appeared entitled, "Alternating Current Clock of the Helios Company." The article deals with a municipal central electric lighting system in use in Cologne (known as the Coerper system), consisting of synchronous electric motors whose armatures drove the clock hands through suitable transmission mechanism. The importance of having the motors run exactly in the same manner as the clock in the central station was stressed, and it was pointed out that any deviation from exact time could be corrected by making slight changes in the rotational speed of the generator which affected "the speed of the current alternation and thereby the running of the synchronous motor in corresponding manner."

The Cologne system was also the subject of an article appearing in England in the Electrical Engineer in 1896. In 1901 there was published in the Revue d'Electricite an article describing an invention by Thury which was said to be suitable for the distribution of time.

In this article the writer states:

"When there is involved as is generally the case the question of transmitting at a distance the movement of the clock, the latter must be supplemented by one or several secondary apparatuses. The complete system will hence be composed of the master clock and a certain number of secondary clocks. In order to actuate the latter Mr. Thury has utilized synchronous motors fed by polyphase currents produced by the master clock."

In 1894 patents were issued in this country and in foreign countries covering the synchronous motor used in the Coerper system and upon the Thury invention.

I find, therefore, that Warren was not the first to suggest a system of electric clocks involving a master clock at the generating station, with secondary clocks run by synchronous motors. Nor was he the first to suggest the importance of constancy of frequency for the operation of these secondary motors in connection with time indicating means, or the first to devise means to attain such constancy. In this respect he was anticipated by Coerper, Thury, and Poole.

Warren was not the first to suggest or employ alternating current for purposes of indicating time. In this respect he was anticipated not only by Coerper, Thury, and Poole, but also by Favarger (United States No. 788,762) (1905).

It is significant that as early as 1878 Fuller had been granted the following claim (United States No. 210,316):

"In an electric-lighting system in which the light is produced by alternating currents, an electro-magnet placed in the main or induced current circuit, or in a shunt therewith connected and having a polarized armature, the vibrations of which actuate a train of register wheels, substantially as and for the purposes specified."

The "purpose specified" obviously was the driving of meter mechanism. Even at that early date he disclaimed any intention of claiming a monopoly upon the movement of clockwork by electric current, as he was then aware that electric currents had been employed for that purpose.

Alternating currents had, prior to Warren's activities, been used to drive motors that could be adapted to move clockworks by the exercise of ordinary mechanical skill. In this category may be found—

Tesla No. 381,968 (1888)

Thompson No. 428,650 (1890)

Wightman No. 562,686 (1896)

Durfee No. 1,167,157 (1916).

6. None of these patents cited by the defendant were considered in the Patent Office. The work of these inventors, together with the published teachings of Elihu Thomson and Charles P. Steinmetz, left only a narrow range for invention in the field of alternate current motors. Into this crowded art Warren entered with his alternating current motor, shown in the patent in suit. In order to determine whether his contribution was patentable, it is necessary to consider more in detail his specific device, the principles which he applied, and the prior art.

The Warren motor consists of an iron magnetic circuit composed of laminated sheet iron, with an opening between the two poles in which a rotor or armature of steel operates. Over the side opposite the opening there is a field coil wound around the iron consisting of copper wires. Each of the two poles is split into two parts, and in one of these parts is placed a short circuited ring or square of copper to produce a dephasing effect. In this magnetic field there is a hard steel disc which rotates and, when properly adjusted, will rotate in full synchronism with the alternating current.

The result is that when the alternating current is applied, a revolving magnetic field is created in which the rotor not only starts instantly but comes up to a speed synchronous with the frequency of the alternating current. This synchronous motor is also capable of stopping substantially in an instant and is arranged with a driving shaft which is geared to the mechanism operating the clock. The device contemplates an electric light alternating current of 60 cycles, producing 3600 revolutions a minute. This rotating magnetic field may be produced by two methods—one by shading the poles, which is the method shown in the patent, and the other by two or more independent currents of different phases. In Warren's third claim he speaks of a self-starting synchronous motor having a split-phase field responsive to a continuous alternating current. If the claim be considered as broad enough to include both methods of producing a split-phase field, there is no doubt on the evidence that each of the methods was old in the art. Thomson, in his patent above cited, shows a shaded pole and fully explains the effect and advantages of a shaded pole and graphically describes several methods by which the shading is accomplished.

In an issue of the Electrical World, dated June 21, 1890, appeared an article by J. A. Fleming, professor of Electrical Engineering in University College, London, on Prof. Thomson's experimentations, including those dealing with shaded poles. He has this to say (page 422):

"This principle of 'shading' a portion of the magnetic pole and hence causing an unsymmetrical distribution of induced currents in a conducting body capable of revolution on a pivot has been developed by Professor Thomson in many extraordinary ways. * * * Given this principle that by properly shading a pole from a portion of a solid body capable of revolution around a line or axis, it is easy to see that countless forms of electromotor can be designed. * * * These experiments can by a little ingenuity be endlessly multiplied when once the fundamental principle is grasped. Bodies can be made to rotate and move, taking their movements from the magnetized space in which they are placed and without being supplied with current from an external force."

This professor also describes a small motor, a model of which was in evidence, showing a laminated ring wound with wire having a slight cut through it causing opposite poles, which are shaded by a set of closed copper bands. Into the opening a copper disc, free to turn on a shaft, is introduced by one edge, which disc turns rapidly when the magnet is excited.

Tesla and Durfee furnish good illustrations of a split-phase field produced by two or more independent currents, or, as it is sometimes called, the resistance-inductive method. Both the shaded pole and the resistance-inductive method produce a split-phase field, and produce upon the rotor the same electrical magnetic effect. In the electrical world one is plainly the equivalent of the other.

7. Warren claimed for his invention certain characteristics which the plaintiffs contend cannot be found in combination in the prior art. These are:

1. A self-starting motor.

2. A motor continuously operated upon a single phase alternating current.

3. An absolutely synchronous motor.

4. A motor capable not only of starting and running synchronously in the magnetic field but also stopping substantially in an instant.

This contention of the plaintiffs requires a further inquiry into the patents cited above. The first in point of time was Fuller who disclosed a motor embodying the principles of the Warren motor which he used in connection with means for operating electric meters. This motor obviously was operated upon a single phase alternating current. His specifications are brief. He does not mention self-starting, but states that "the movement of the armature caused by the change of polarity of the electro-magnets produced by the alternating of the currents will impart a forward movement to the registering mechanism" from which the inference is reasonable that his motor was self-starting.

From the specifications and the evidence, I am unable to find whether this motor was an absolutely synchronous motor or one capable of starting and stopping substantially in an instant.

Coerper's motor obviously was not self-starting, but it was a synchronous motor, operating on an alternating current.

Thury's motor can be differentiated from Warren's by the fact that it operated upon a polyphase current rather than a single phase current which is supplied by the central company for household pur-

poses. I find, on the somewhat conflicting evidence, that it was self-starting and operated absolutely in synchronism at a speed of 3600 r. p. m. on a 60-cycle circuit. Whether it started and stopped substantially on the instant is not clearly shown, and the experiments in court would indicate it did not possess this characteristic.

Tesla (No. 381,968) shows a motor composed of a disc mounted within an annular field magnet provided with magnetized coils; in other words, a rotor moving in a revolving magnetic field and operating synchronously with the alternating current. This motor, however, utilized polyphase currents rather than the single phase current. The motor is self-starting and operates uniformly in the field produced by polyphase currents.

The difficulty which confronted Warren was the production of a motor which would start and operate synchronously in a rotating magnetic field which could be produced from the ordinary single phase alternating current available in lamp sockets. The solution of this problem, plaintiffs say, amounted to invention.

Durfee's motor, while not designed for use in the movement of clockwork, was nevertheless one which possessed all the characteristics of the Warren motor. It was self-starting, fully synchronous, and the only differentiating features between the Durfee and the Warren motors, apart from structural differences, were that Durfee's motor was used for moving meter indicators rather than timing devices and that he used the resistance-inductive method of producing a split-phase field.

It is undoubtedly true, as plaintiff's expert testified, that the particular design shown in Durfee's specifications would not be practicable for use as a clock motor, but it would seem clear that only ordinary mechanical skill would be required to adapt such a motor to the operation of clock mechanism equally as well as to operation of an indicator for use in connection with electric meters.

With reference to all of these earlier motors, it is difficult to say whether they met the requirement of the Warren claim relating to the capacity of the motor to start and stop substantially in an instant, but it appeared in evidence that this matter depended upon the material of which the rotating disc was composed. A light disc having a little inertia would stop much more quickly than a heavy disc with greater inertia.

## II. Warren Indicator Patent.

1. On March 23, 1920, letters patent of the United States No. 1,334,423 issued to Henry E. Warren upon his application filed January 4, 1917. This patent relates to an indicator to be used in connection with the clock described in the Warren clock patent. It is a simple device by means of which the word "reset" appears in an opening on the dial of the clock when, for any reason, there has been an interruption of current.

2. Claims 1, 4, and 7 are in issue. Claim 1 may be taken as illustrative:

"1. The combination with an instrument having a timing function driven by an electric motor, of a device under the influence of the current supplied to said motor while the motor is uninterruptedly supplied with current and responsive to an interruption of said current to indicate said interruption thereafter without influencing the continuity of flow of the current in either condition."

Claim 4 is for the same combination of a timing instrument and a device inactive while the motor is supplied with current and becomes active to indicate a failure of current when it is interrupted.

Claim 7 is for a combination between an electrically driven clock and an indicating device moving in position when the clock is stopped by failure of current.

3. The indicating device, referred to in these several combination claims, comprises a visual indicator in the form of a drop plate attached to a wire rod of magnetizable material. This wire is conveniently coiled to embrace a pivoted pin to form a fulcrum. The drop plate is attached to one arm of the lever while the pendant arm is disposed somewhat at an angle to the other arm.

The device comprises also a stator excited by the same · alternating current which supplies the motor driving the clock mechanism. The lower arm of the lever, when brought within the influence of the magnetic field of the stator, moves the drop plate behind a portion of the clock dial so as to be concealed from view. When there is an interruption of the current, and the lever is no longer under the influence of the magnetic field, the force of gravity brings the indicating drop plate into view

in the front of the dial of the clock. This lower arm of the lever is arrested in its movement toward the stator by a pin, thus leaving a small air gap between the arm and the stator, thereby preventing an annoying humming sound which might occur on account of the alternating current. The lever to which the indicating device is attached is pivoted so that it swings very easily, and if, due to the interruption of the current, the lower arm is freed from magnetic influence, it will oscillate like a pendulum. The result is that the indicator will only show interruptions in the current which are of sufficiently long duration to allow the oscillations of the pendulum to diminish so as to bring the arm wholly without the magnetic influence of the stator. It is quite obvious that this indicator is useful only in showing that the clock has stopped by reason of the interruption in the electric current. If, for any other reason, the clock stopped, there would be no movement of the indicating device. There is no co-operative function. The only connection between the indicator and the timing instrument is the fact that the same alternating current excites both the stator and the motor running the clock.

4. The defendant has cited, in anticipation of the claims of the indicator patent, Perkins (United States No. 227,704), which shows the ordinary form of an enunciator such as is frequently used in hotels where, upon the interruption of the current in the circuit, the magnetic hold on the enunciator indicator is released and the indicator drops into view.

5. Defendant is using, in its clocks, a device which indicates when there has been an interruption of the current for the smallest interval of time. It does not depend upon the law of gravity to bring the indicating disc into view. Instead, there is a spring which, when the magnetic influence is broken, pulls the lever away from the stator, thus avoiding all oscillation of the arm which comes within the influence of the magnetic field.

Instead of a pin to provide a small air gap between the end of the arm and the stator, the defendant avoids the humming sound by attaching a felt pad to the end of the arm which comes in contact with the stator.

### III. Holtz Patent.

1. On an application filed October 1, 1921, by Frederick C. Holtz, letters patent of the United States No. 1,892,552 were issued to the plaintiff Sangamo Electric Company. This alleged invention related to alternating current motors, known as the "subsynchronous motors." The applicant states that his invention is applicable to motors of various designs and intended for a great variety of uses, but the motor illustrated is one intended for use in connection with electric meters.

Holtz's motor was a self-starting synchronous motor, operated by a single phase alternating current. While it operated in synchronism with the frequency of the alternations of the current supplied to it, it operated not at full synchronous speed, as did the Warren motor, but at a definite fraction of full synchronous speed, which fraction was determined by the relation of a greater number of rotor poles to the smaller number of field poles. In other words, it operated at a subsynchronous speed.

2. According to the disclosures of this patent, the field structure of Holtz's motor in no way differed from earlier motors. He produced a split-phase field by the use of shading coils. The departure structurally from Warren's clock motor is to be found in the construction of the revolving member, or rotor. This rotor, or armature, was constructed of circular soft steel laminations in which were cut three slots equally spaced around the armature. In this iron structure there were placed six copper rods equally spaced about the armature, three of them being in the slots above mentioned. These copper rods passed entirely through the armature structure and fastened to a copper end plate on each end of the armature. If the copper structure were removed entirely from the armature and were intact, it would resemble a squirrel cage, and for that reason the structure has been commonly called the "squirrel cage" type of rotor.

This copper structure forms an induction motor element and provides short circuited paths in which the induced current can flow. The squirrel cage type of rotor was a common form of induction motor element. The rotor comprises another element, namely, a hardened steel plate or disc attached to the armature and rotating with it. This disc is star-shaped, with six projecting poles, the outer surfaces of which coincide with the periphery of the armature.

The purpose of this star-shaped disc, as described in the patent, is to give the magnetic circuit of the rotor as a whole the effect of having six salient poles, and giving the motor a pronounced reaction characteristic at a speed corresponding to that of a six-pole synchronous motor.

The induction element is responsive to the rotating field, and its function is to produce starting and accelerating torque. The reaction element produces the effect of salient poles in excess of the number of poles of the stator.

An induction motor has no fixed speed. Its speed varies with its load, temperature, and other factors and never quite equals the speed of the rotating magnetic field which actuates it. The speed of the field is called in the patent the "full theoretical speed." The function of the reaction element which Holtz combined with an induction motor element in a single armature is to cause the motor, at a predetermined subsynchronous speed, to lock into synchronism with the rotating magnetic field. The element specifically shown in the patent to perform this function is a star plate, made of steel, attached to the induction motor element, and is provided with six equally spaced salient projecting poles.

3. Without attempting to explain the electrical phenomena that take place, it is sufficient to say that the motor comprises two members, an induction motor element and a reaction motor element, both carried on the same shaft and so adjusted and proportioned as to give to the rotor a true synchronous speed but less than the full synchronous speed. That is, the revolutions with a six-pole reaction element will be one-third of 3600 r.p.m., or 1200 r.p.m.

In his specifications Holtz says:

"I am aware that it has heretofore been proposed to provide a reaction motor with a greater number of rotor poles than stator poles so that the motor will operate at a true synchronous speed corresponding to the greater number of poles. Such an arrangement is described in Coerper Patent No. 527,195. I am also aware that it is old to provide a reaction motor with induction motor starting means where the reaction motor and induction motor elements are arranged for the same synchronous speed corresponding to that of the stator pole number. For example, as is described in Warren Patent No. 1,283,432.

"However, I believe I am the first to provide an induction reaction motor where the rotor operates at a true synchronous speed below that corresponding to the maximum theoretical induction motor speed so as to obtain the advantage of the induction motor action for both starting and synchronous operation.

"While I have illustrated the rotating disc 14 as being provided with six poles 25, my invention is not limited to that construction or to the use of the specific armature shown and described as various arrangements or modifications may be employed. So far as I am aware, I am the first in the art to provide for maintaining the speed of an alternating current motor having an induction rotor approximately constant under a constant frequency of alternations of the alternating current supply by magnetically interposing resistance to the attainment by said rotor of its free running speed, and therefore, this mode of operation as well as the apparatus by which it may be practiced are claimed generically as my invention."

4. The letters patent comprise 28 claims. Of these claims 15 are involved in this controversy. They are claims 1, 2, 3, 4, 6, 11, 12, 13, 16, 17, 19, 20, 22, 27, and 28.

In these several claims, Holtz has stated his alleged invention in so many different ways, with only slight differences, that it is difficult to determine just which will serve as the best illustration of his alleged discovery. However, claims Nos. 3 and 17 will probably best serve the purposes of the case.

"3. An induction reaction motor comprising relatively rotatable cooperating primary and secondary members, said primary member comprising means for producing a strongly pulsating, shifting magnetic field and said secondary member being designed to give both reaction and induction motor characteristics, characterized by an arrangement such that the reaction characteristic predominates over the induction motor characteristic at a definite synchronous speed, at which speed the torque due to the induction motor characteristic is of appreciable magnitude."

"17. An alternating-current motor comprising an armature member having char-

acteristics producing the effect of a relatively large number of salient poles, means on said armature for causing the same to operate as the secondary member of an induction motor, and an inducing member for producing rotation of said armature member, said inducing member having a smaller number of poles than said armature member, each of the poles on the inducing member being split into two halves, and means for causing the alternating magnetic field in one of the halves of each pole to lag behind the other, the width and relative spacing of the pole halves and the amount of dephasing of the magnetic fields therein being so proportioned, in relation to the number of armature poles, that, when the motor is operating at a synchronous speed corresponding to the number of armature poles, an armature pole will come under each of the pole halves of the inducing member as the alternating flux therein approaches a maximum value in either direction."

In his application Holtz has stated the features of his invention as follows:

"The stator element shown in the drawing has salient poles split into halves forming polar projections. A shading coil is provided on certain of the polar projections, which dephases the flux in one portion of each pole. The flux thus produced by the stator may be considered as being divided into a rotating or a shifting field component and a strongly pulsating field component. The secondary illustrated comprises two portions, namely, an induction motor secondary forming a plurality of short-circuited paths cooperating with and responsive to the rotating or shifting component of the flux to produce starting and accelerating torque and a slotted magnetic portion producing the effect of salient poles in excess of the number of poles of the stator; the open slots in the magnetic end plate 14 are preferably in alignment with the open and closed slots containing the squirrel cage bars 23 as illustrated. The teeth between the slots give a salient pole effect which cooperates with and responds to the pulsating flux component to produce a predominating synchronous torque at a speed preferably below the speed where the accelerating torque diminishes to zero."

5. It was admitted in argument that Holtz's improvement lay wholly in his rotor element. In his file wrapper Holtz

conceded that reaction motors and induction motors were old as well as the structure necessary to produce them, and, further, that the idea of combining induction motor and reaction motor characteristics in the same motor structure was likewise old. He claims that he had taught that a "new and highly beneficial result is obtainable by a new relation existing between the reaction and the induction motor parts with respect to their speed and torque characteristics."

From the application, the file wrapper, and arguments of counsel, I gather that Holtz based his claim of novelty and utility for his motor upon the fact that he was the first to discover a self-starting motor that would operate at a subsynchronous speed. Or, to state it differently, that even though the prior art showed combinations of induction motor and reaction motor elements in the same structure, in such motors the reaction motor characteristic predominated at the full synchronous speed.

In order to determine whether Holtz' views as to the novel features of his motor were in accordance with the facts, it will be necessary to consider certain prior patents, cited by the defendant.

6. Defendant has cited Thomson No. 428,650 (1890), Tesla No. 459,772 (1891), Wightman No. 562,686 (1896), and Warren No. 1,283,432 (1918). These references show rotors operating at a synchronous speed below that corresponding to the maximum theoretical induction motor speed, and in each the induction and reaction motor elements are associated on the same shaft.

The scope of the teachings of these several patents is questioned by the plaintiffs, necessitating further findings as to what the patents disclosed.

Thomson dealt largely with different methods of obtaining a split phase-field by shading coils. He did, however, in several of his figures, show armatures composed of iron and copper, and in one of them especially (Figure 24) he showed a copper disc with iron projections, imbedded in copper, which extended radially outward from the center but stopped short of the periphery instead of extending inward from the periphery, as shown in another figure. This armature would have six poles. While Thomson does not use the word "subsynchronous," either in his specifications or his claims, I find

that the motor constructed according to his teachings, with proper adjustments and experiments, was a self-starting, subsynchronous motor. Thomson says, in his specifications, that:

"It is sometimes desirable to so form the armature-disc D, Fig. 23, or the disc. Fig. 16, when the iron plate F is between the two copper portions, so that the iron projects through, a section F of the plate, Fig. 24, being of iron and the portion C of copper. The object of this is to cause a tendency to synchronism with the rate of alternations by having certain portions of the armature-surface incapable of causing such vigorous closed circuits as the portions provided with the copper facings."

There can be no doubt that the Tesla patent shows a subsynchronous self-starting motor. Plaintiffs' objection to this device as anticipatory is that Tesla had, in effect, constructed two motors and placed them upon the same shaft, one an induction motor and the other a reaction motor, each with its separate magnetic field.

Defendant's expert testified, referring to the Tesla motor, that:

"There is everything there that there is in Holtz. There is the adjacency of the induction element and the reaction element; there is the sub-synchronous speed; there is the rotating pulsating, shifting, revolving field in combination with the induction element for producing starting and accelerating, and there is a reaction motor torque to lock in at a speed less than the speed corresponding to the induction motor element."

The evidence warrants the finding that this statement is true.

Wightman in his patent deals with armatures as well as with the rotating and pulsating magnetic field. He shows that the armature itself may be constructed in very many ways. It may be a body of iron, laminated or not, with closed-circuit coils placed upon its face, or it may have recesses for the reception of such closed coils. One of his figures shows an armature consisting of iron, with an outer shell of copper, with windows or openings cut therein. This shell of copper acts as the induction motor element, and with the windows cut, the poles, due to the iron within the copper shell, will give a tendency to synchronize.

Figures accompanying his patent show eight different constructions, and one of them (Fig. 11) shows an armature with the edges cut away so as to provide poles which, as Wightman says, tend to the synchronizing of the structure with the rate of alternations in the circuit. This can be done by notching the edge of the armature-core at NNNN more or less deeply.

Inasmuch as the speed of the rotor depends upon the relation which the number of poles in the rotor bears to the poles in the stator, it follows that, since Fig. 11 shows 4 rotor poles operating in a magnetic field of 2 poles, it is apparent that Wightman must have had reference to a synchronization less than full synchronization.

Warren shows a rotor combining the two elements, the element for starting and accelerating being a disc not unlike that shown in the Warren clock patent, and an element for producing a reaction torque, causing the rotor to lock-in at synchronous speed. This reaction element consists of pins arranged in pairs diametrically on the discs and projecting longitudinally. With a four-pin rotor, the subsynchronous speed would be 1800 revolutions per minute or, with the six-pin 1200 r.p.m., being the speed of the Holtz patent.

7. The defendant introduced in evidence a motor, which Thomson had assembled long before Holtz came into the art, which appears to be substantially along the lines of his patent and which was frequently described and illustrated in literature as early as 1890. There was also in evidence a model recently constructed which embodied the principles of the Thomson patent. Models of the Wightman and Tesla motors were also produced by the defendant and operated in court.

With respect to all of these motors, it appeared that there had been a departure from the patents with respect to the relative proportion of the various ingredients entering into the armature and that such departures were necessary in order that the motors should operate as self-starting, subsynchronous motors.

Even with this experimentation and adjusting, the Thomson motors did not operate with entire satisfaction, but I find that, with the skill of an expert in elec-

trical matters, the teachings of Thomson or Wightman or Tesla would have enabled one, after experiments, adjustments, and modifications respecting size and proportion and ratios, to have constructed a self-starting subsynchronous motor without invoking any of the learning of Holtz.

What Holtz apparently did was to take the well-known single phase induction motor with a split-phase field and add to the induction element of the rotor a star-plate of hardened steel, to secure a lock-in through the reaction torque at a speed less than that corresponding to the speed of the field. He put the two elements on the same shaft, having them affected by a field which, as Holtz admits, was then well known. These two elements do not affect each other's operation. They are not operating in the same zone of the rotating field. Neither influences the other. This is true not only of the Holtz patent but of the Warren and Thomson as well.

The fact should be added that before a patent had actually issued on Holtz's alleged invention he had abandoned the star-plate before any great commercial use had been made of it. The armature which ultimately found its way into use commercially was one built according to a later patent in which the reaction element did not consist of a star-plate attached to the body of the armature, but the reaction element was introduced in an entirely different manner.

8. The defendant uses in its electric clock a motor running upon a single phase alternating current in which the shaded pole principle is used to produce a split-phase field.

The field element of the motor is substantially identical with that of the Warren and Holtz patents. The rotor, however, differs in construction from the rotor in the Warren patent and structurally more nearly resembles that of the Holtz patent.

The rotor structure is made of circular iron laminations with a copper shell over them. Around the rim of the iron laminations there are cut 14 poles. These 14 poles cut around the periphery constitute the synchronous motor or reaction element of the motor. The copper shell pressed around the laminations forms a short circuited winding and constitutes the induction motor element of defendant's armature. When the rotor is placed in the field structure and the current is applied, the rotating shifting field, due to the shaded coils induces currents in this cylindrical shell which has induction motor action and that produces the starting torque and accelerates the motor up to its subsynchronous speed, and the 14 poles cause the rotor to lock-in at a subsynchronous speed of one-seventh of 3600 r.p.m.

The rotor of the defendant's motor is constructed substantially according to the teachings of letters patent of the United States (No. 1,978,855) issued in 1934 on the application of Werner H. Balzer to the defendant company. This patent claims a rotor for an alternating current motor consisting of an annular shell, two groups of axially alined discs of magnetic metal within said shell, the discs having peripheral polar projections or poles, one group of 8 discs having such projections in axial alinement with one another, and the other group of 5 having their polar projections spaced angularly midway between the polar projections of the 8 discs of the first group.

The defendant's rotor does not contain any star-shaped disc upon the same shaft with the armature as shown in the Holtz patented motor.

It was in evidence that the defendant's motor was distinguishable from Holtz's in this respect, namely, that if either the induction or reaction element were removed in the defendant's motor, it did not start or accelerate. The Holtz motor is operable as a motor with either element removed; that is, his motor will start and accelerate if the iron star wheel is removed, and his motor will lock-in at subsynchronous speed if the induction element is removed. In this respect the Holtz motor is comparable with Tesla's.

9. The defendant has set up, as a further defense, fraud practiced by Holtz in obtaining his patent. In view of the conclusion which I have reached regarding the validity of this patent, it is unnecessary to incorporate in this statement of facts any statement other than that, upon all the evidence, I find that the defendant has not established this defense.

## Conclusions of Law.

### Warren Clock Patent.

We have seen that Warren was not the first to conceive the idea of a system of secondary clocks actuated by an

electric current controlled by a master clock at the central station. In this he was anticipated by Coerper, Thury, and Poole. A patent on his system was declared invalid in the Sixth Circuit. Kodel Electric & Manufacturing Co.. v. Warren Telechron Clock Co. (C.C.A.) 62 F.(2d) 692. We are told by an inventor of an electric motor capable of running on an alternating current that prior to 1878 electric currents had been employed for moving clock works. See Schiff v. Hammond Clock Co. (C.C.A.) 69 F.(2d) 742. The fact is established that, long before Warren entered the art, synchronous motors were used to move the mechanism of timing devices, and self-starting synchronous motors were known. The only field open to him was to devise a motor for operating timing devices that could be said to be a patentable improvement.

■ On the evidence it is clear that Warren did bring out a self-starting motor, capable of being run on the alternating current used for household purposes, which was reliable and compact and adapted for use in timing devices. No doubt this required experimentation in order to secure the desired results in uniformity and constancy of speed of the motor. It is equally apparent that the problem called for expert skill but whether, in view of the prior art and the decisions of the court, Warren's devices exhibit inventive genius is, at least, doubtful. The magnetic-revolving field was old. The split-phase field produced by shaded poles was widely known among electrical engineers. The steel disc rotor with its starting characteristics and its synchronous speed had been revealed by Thomson, Tesla, and Steinmetz. In short, old principles were applied to old means to produce no new function or result. This is not invention. Grinnell Washing Machine Co. v. E. E. Johnson Co., 247 U.S. 426, 432, 38 S.Ct. 547, 62 L.Ed. 1196; Concrete Appliances Co. v. Gomery, 269 U.S. 177, 184, 185, 46 S.Ct. 42, 70 L.Ed. 222; Powers-Kennedy Contracting Corporation v. Concrete Mixing & Conveying Co., 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278; Electric Cable Joint Co. v. Brooklyn Edison Co., 292 U.S. 69, 80, 54 S.Ct. 586, 78 L.Ed. 1131; Paramount Publix Corporation v. American Tri-Ergon Corporation, 294 U.S. 464, 471, 473, 55 S.Ct. 449, 79 L.Ed. 997; Altoona Publix Theatres, Inc., v. American Tri-Ergon Corporation, 294 U.S. 477, 55 S.Ct. 455, 79 L.Ed. 1005.

■ All that Warren did was to modify form and size of elements that had earlier appeared in the art in the same combination. This, in my opinion, is not enough to sustain the patent. Batcheller v. Henry Cole Co. (D.C.) 7 F.Supp. 898, 902; Powers-Kennedy Corporation v. Concrete Mixing & Conveying Co., supra; Paramount Publix Corporation v. American Tri-Ergon Corporation, supra; Utah Radio Products Co. v. Boudette et al. (D.C.) 8 F.Supp. 5.

■ However, if we take a view more favorable to Warren, it is settled that his monopoly must be restricted to his invention. Kodel Elec. & Mfg. Co. v. Warren Telechron Clock Co., supra.

■ He can claim no more than the specific device disclosed in his specifications. Thus limited, as they must be by the prior art, the claims cannot be extended to cover defendant's motor.' Warren's claim must be limited to a motor which has for its rotating element a disc, as distinguished from the squirrel cage armature in defendant's motor. The motor disclosed in Warren's clock patent may be classed as a hysteresis motor described earlier by Steinmetz and shown by Thomson and Tesla, and not as an induction-reaction motor which defendant employs. If Warren's claims be given a scope broad enough to reach defendant's motor, they read upon earlier patents cited in this opinion. If limited in scope to his actual device, assuming it to be patentable invention, then defendant does not infringe. Since the patent has expired and there is no infringement, it becomes a matter of little importance in these proceedings whether, the patent be declared valid or invalid.

### Warren Indicator Patent.

This simple device employing the forces of magnetic attraction and of gravity, neither of which Warren can claim to have discovered, may have involved enough of ingenuity to enable one to say that it rose to the dignity of invention, but in the nature of the case the invention must be restricted, as I think the claims are restricted, to the specific arrangement shown in the patent. So construed, defendant's indicator does not infringe. Defendant does not utilize the force of grav-

ity to bring the indicator into view. Rather, it uses a spring. Structurally the two devices are dissimilar. It cannot be successfully argued that Warren had any right to monopolize the entire field so as to exclude any other manufacturer of electric clocks from using any form of indicator to show an interruption of the electric current. There is nothing in the case to warrant any such broad 'scope to the claims in suit.

Defendant has argued, and its expert has testified, that the patent cannot be sustained as a combination patent since there is no interrelated action between the clock and the indicator. The only connection between the two is that the magnetic influence is derived from the same source as that which actuates the motor, namely, the alternating current. It may be true that the indicator will not operate if the clock stops for any other reason than interruption of the current, but an interruption of the current does stop the clock and at the same time causes the indicating plate to fall into view. In this sense there is a joint operation which may well mean something more than a mere aggregation of old elements. American Chocolate Machinery Co. v. Helmstetter (C.C.A.) 142 F. 978. Nor does the simplicity of the device necessarily negative invention. Dececo Co. v. George E. Gilchrist Co. (C.C.A.) 125 F. 293; Consolidated Window Glass Co. v. Window Glass Machinery Co. (C.C.A.) 261 F. 362.

My conclusion respecting this patent is that it is valid but not infringed.

### Holtz Patent.

In the consideration of this patent, we have to deal only with an alleged improvement upon the rotating element of a small electric motor.

We have seen, in the consideration of the Warren clock patent, that the stator element, with its shifting and pulsating magnetic field, was old, and that there was no novelty in a motor in which a split-phase field was produced by means of shaded poles or other equivalent means.

Holtz conceded all this. Furthermore, with respect to his motor he admitted that the prior art showed an induction element and a reaction motor element assembled in one unitary armature, and that the squirrel cage type of induction motor which he employed was one which had been in common use prior to his advent into the field. Notwithstanding these admissions, he has been granted claims which, as he interprets them, would preempt the whole field of subsynchronous, self-starting motors.

The defendant contends that he was not entitled to so extensive a monopoly because his motor does not possess patentable novelty in view of the prior art, and whatever improvements he may have made, his contribution did not rise to the dignity of invention.

It is quite apparent from reading the specifications in the Holtz patent, as well as correspondence appearing in the file wrapper, that all that Holtz thought he did was to discover a new relation between the two elements which produced a result that was capable of being utilized for the movement of mechanical apparatus requiring small electric motors.

The principles used by Holtz were not new. The individual elements used in his rotor were not new. The combination was old, and the result produced, namely, subsynchronous speed, was likewise old. It is my opinion that his contribution to the art was merely the product of experimentation and trial, modifying old structures and working out proportions and relationship between the several elements, and thereby securing a self-starting, synchronous motor, running at a speed less than full synchronism.

From predecessors in the art he must have learned the underlying principles of electricity which enabled him to produce this result, and the work of arranging, proportioning, and modifying the structure of armatures shown in the earlier patents, like Thomson, Wightman, or Tesla, did not call for the exercise of inventive genius. Admittedly, this would mean a high degree of skill because Holtz was dealing with an extremely technical field of science; but, in my opinion, it would not mean such invention as would deny to other experts in electricity an opportunity to experiment, modify, arrange, and assemble the same elements according to the same well-known principles of the science of electricity and magnetic attraction.

In this case it could be said, as was said in Barber-Colman Co. v. A. G. Redmond Co. (D.C.) 7 F.Supp. 508, 510, where the court was dealing with a patent involving small electric motors, that:

"Every element contained in plaintiff's patent is found in the prior art. * * *

"This is a difficult field of science not yet fully understood, and every one desiring to build a motor must cut and try, using things known, to get the results they want, or copy one already existing, suitable for the purpose. This cut and try method was followed by the patentees using these old principles. They have not established any new and useful rules. If you permit one man to experiment and make this shorter and that longer, using all old elements in the same way, until he gets down to a good working device, and then he is able to get a patent on those dimensions, which exact dimensions you do not find anywhere in the art, then other men must stop experimenting in that preferred sphere because a patent has been granted. That is a dangerous thing, harmful to the business world, and it is the duty of the court to closely scrutinize a patent of this kind for the purpose of discovering whether there is really a new inventive thought, or simply a desirable type of the old thing. I think this case is a good illustration of that danger."

If, as a result of Holtz' work, he produced a specific device which could be said to be a motor better adapted to the contemplated purposes than any that had preceded it, he could no doubt be allowed a monopoly on his specific device; but when he undertakes to extend his monopoly to the entire field of subsynchronous, self-starting motors, he claims more than is warranted by the discoveries and teachings of earlier scientists in the field, like Thomson, Wightman, Steinmetz, and Tesla.

In the case at bar the rule laid down in Smith v. Nichols, 21 Wall. 112, 119, 22 L.Ed. 566, and approved in Burt v. Evory, 133 U.S. 349, 358, 10 S.Ct. 394, 397, 33 L.Ed. 647, may well be applied. There the court said:

" 'But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way, by substantially the same means, with better results, is not such invention as will sustain a patent. These rules apply alike, whether what preceded was covered by a patent or rested only in public knowledge and use. In neither case can there be an evasion of such domain, and an appropriation of anything found there. In one case everything belongs to the prior patentee; in the other, to the public at large.'

"Neither is it invention to combine old devices into a new article without producing any new mode of operation."

The defendant merely took the teachings of these earlier masters and, by process of cutting and trying, produced a self-starting, subsynchronous motor which differs both structurally and functionally from that of Holtz. If Tesla or Wightman had followed Holtz with motors embodying armatures shown in their respective patents, Holtz undoubtedly would have descended upon both as infringers. Applying the rule that "that which infringes if later would anticipate if earlier," Tesla and Wightman, and perhaps Thomson, anticipated Holtz.

If we are, therefore, to give to the claims a construction sufficiently broad to include all self-starting, subsynchronous motors employing both the induction motor element and the reaction motor element in the same device, and I think the claims must be so construed, they read upon the prior art and are invalid. My conclusion respecting the Holtz patent is that it is invalid.

It follows that the bill of complaint in No. 3865, involving the Warren clock patent and the Warren indicator patent may be dismissed.

Inasmuch as plaintiffs have abandoned any claim respecting patent No. 1,262,575 to Warren, the bill of complaint in No. 3866, involving said patent and the Warren indicator patent, may be dismissed.

In Nos. 3867 and 3868, involving the Holtz patent, the bill of complaint in each case may be dismissed.